**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Olie Duane JONES, Sr., and Lemuel H. Stockmar, Defendants-Appellants.**

**No. 72–2580.**

United States Court of Appeals, Fifth Circuit.

July 11, 1973.

James M. Russ, Orlando, Fla. (Court appointed), for Jones.

Thomas W. Gibson, Orlando, Fla. (Court appointed), for Stockmar.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Alan C. Todd, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

TUTTLE, Circuit Judge:

Appellants Olie Duane Jones and Lemuel H. Stockmar were convicted in the District Court for the Middle District of Florida on three counts of an indictment charging numerous violations of the Drug Abuse Prevention and Control Act of 1970, 21 U.S.C.A. § 801 et seq. Finding that none of the several errors assigned on this appeal is meritorious, we affirm.

The original indictment against both these defendants was in seventeen counts, Stockmar being charged in thirteen and Jones in seven[1] The only

---

1. Jones and Stockmar were tried jointly with a third defendant, James Edwin Stephens, who has not appealed from his conviction.

counts with which we are here concerned are those upon which Jones and Stockmar were convicted, namely, Counts 11, 12, and 17. Count 11 charged that on or about June 30, 1971, in Seminole County, Florida, Stockmar and Jones, among others, unlawfully possessed with intent to distribute and dispense approximately 850 pounds of marijuana in violation of 21 U.S.C.A. § 841(a)(1), and 18 U.S.C. § 2. Count 12 charged that on the same date these defendants unlawfully imported into the United States from the Bahamas the alleged 850 pounds of marijuana, this in violation of 21 U.S.C.A. § 952(a) and § 960(a)(1) and 18 U.S.C.A. § 2. Count 17 was a conspiracy charge. It alleged that from about May 6, 1971, and continuously thereafter until July, 1971, several persons, appellants among them, conspired to import marijuana unlawfully into the United States from a foreign country, in violation of 21 U.S.C.A. § 952(a).

The government's case rested largely on the testimony of certain co-conspirators, particularly that of a Bobby C. Wells who was involved in the alleged smuggling operation from its inception until its termination. Taken in the light most favorable to the government the evidence introduced at trial established the following: On the evening of May 6, 1971, Ralph Thomas Malloch, Jr., James Durden, Jesse E. Farris, James Edwin Stephens, and Bobby C. Wells met in Atlanta, Georgia, to discuss the possibility of importing marijuana into the United States from the Caribbean area. The next day Malloch, Durden, Farris, and Wells, having borrowed Stockmar's private airplane, flew to Miami, Florida, where they attempted to locate a boat suitable for marijuana smuggling or alternatively a Miami contact with ties to a commercial airline. These efforts proved unsuccessful and the four returned to Atlanta.

Thereafter, Malloch, Wells, and Stockmar met at a truck stop near Douglasville, Georgia, where they discussed the possibilities of using a private airplane to smuggle marijuana into the country.

The following day, Wednesday, May 12, 1971, Malloch, Durden, Stephens, Farris, Wells, and Stockmar worked out the mechanics of their first actual smuggling venture. Without going into the details of this plan, subsequently altered slightly, and without describing the pre-arrangements undertaken, we think it sufficient to say that on May 19, 1971, Wells and Stockmar, who were by then in Kingston, Jamaica, flew in Stockmar's airplane to an abandoned Jamaica airstrip where they purchased from a local contact named "Jack" approximately 212 pounds of marijuana. With the marijuana aboard Wells and Stockmar then flew to an abandoned airstrip in the Bahamas where the cargo was dropped temporarily in order that the two might clear customs at a nearby commercial airport, Andros International. Having cleared Bahamian customs, Wells and Stockmar returned to the abandoned airstrip, picked up the load of marijuana, and flew directly from the Bahamas to an abandoned airport in Volusia County, Florida. There they were met by Durden, Malloch, and Farris who unloaded the marijuana from Stockmar's airplane and transferred it to a waiting automobile which was then driven to Atlanta by Farris and Durden. This marijuana was subsequently sold for a substantial price and the profits were distributed among the participants.

Shortly thereafter Stockmar, Wells, and Stephens decided to cut Malloch, Durden, and Farris out of the operation. At the same time another marijuana run was planned.

On about the 26th of May, 1971, Stephens, Wells, Mrs. Stockmar, and Stockmar, by pre-arrangement, met appellant Jones at a local airport near Atlanta. Jones, who had previously discussed the matter with Stockmar, agreed to act as the "lookout man" at the abandoned airstrip in the Bahamas. Another individual, Victor Burns, was to meet the aircraft in Florida when it returned from the Bahamas with the next load of marijuana.

As to this particular trip (and subsequent ones) Stephens, rather than Wells, accompanied Stockmar to the Caribbean islands to procure marijuana from the local contact.[2] Wells testified that on June 1, 1971, Stephens and Stockmar arrived at Immokalee Airport in Florida, this time in a rented aircraft, with a cargo of about 170 pounds of marijuana. Wells and Burns assisted Stephens in unloading the marijuana and transferring it to two rented automobiles which Wells and Burns then drove back to Atlanta. Like the first this load was subsequently sold for a substantial sum of money (about $12,500) and the profits were distributed among the participants.

A new venture was planned, this time to utilize two aircraft, one to be flown by Stockmar and Stephens to make the initial pickup, the other with Jones and Wells aboard to meet Stockmar's airplane at the abandoned airstrip in the Bahamas where the load would be transferred and flown directly from the Bahamas to Florida by Jones and Wells. On June 14, 1971, pursuant to this plan, Wells and Jones flew to the abandoned airfield in the Bahamas where they met Stephens and Stockmar as scheduled. The four men transferred, according to Wells' testimony, about 1,000 pounds of marijuana from the one plane to the other and Wells and Jones then flew to the Sebastian Airport in Florida where they were met by Burns. At the Sebastian Airport Wells and Burns unloaded the bundles of marijuana onto the ground and then Wells and Jones flew to Jacksonville, Florida, to clear customs.

That same afternoon law enforcement officers recovered at Sebastian Airport approximately 40 bundles of a substance weighing 900 pounds which later was tested by the U. S. Customs Laboratory at Savannah, Georgia, and found to be marijuana.

Having been advised by Burns that the load had been "busted" Stockmar, Jones, Stephens, and Wells returned to the Sebastian Airport in a rental car, but were unsuccessful in their efforts to find the marijuana left there earlier.

Shortly thereafter a fourth, and what proved to be the final, venture was planned. It was this venture, occurring on June 30, 1971, which was the subject matter of Counts 11 and 12 of the indictment and for which both Jones and Stockmar were convicted by the jury. Without detailing the operation as testified to by Wells, we would point out that it involved basically the same type of modus operandi as the previous trip.[3] The load of marijuana, weighing approximately 850 pounds, was brought by Jones and Wells by aircraft to an abandoned airfield (Osceola) in Florida where it was placed in a Chevrolet camper by Jones, Wells, and Stephens. Wells and Stephens then drove the camper to Atlanta where the marijuana was sold for about $100,000.

Jones and Stockmar urge vigorously that the foregoing facts demonstrate the existence, not a single conspiracy, as charged by the government in Count 17 of the indictment, but a multiplicity of conspiracies. They argue that since the several efforts at smuggling marijuana, alleged in the indictment as constituting an ongoing conspiracy, involved varying casts of characters and different modes of operation, each of these transactions

---

2. The government's case with respect to these later trips rested almost exclusively on Wells' testimony, corroborated to an extent by hotel receipts and the like. Since Wells was not thereafter a party to the procurement stage of the smuggling operation, he was unable to testify of his own knowledge that Stephens and Stockmar purchased these subsequent loads of marijuana from the same Jamaican contact as had been done on the first trip in mid-May.

3. Although Wells' testimony formed the primary basis for the government's case against the defendants with respect to Counts 11 and 12 of the indictment, his story was corroborated by certain eyewitnesses who testified that they had seen the defendants at various times during the operation as described by Wells.

should be treated as a single conspiracy in and of itself and not as part of a larger conspiracy. The variance in proof, under the rule announced in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), they say, warrants reversal of their convictions on the conspiracy count.

 We are of the view, however, that the evidence is consistent with the jury's finding of a single conspiracy. Without repeating all that was said in the lengthy recitation of facts, we would point out that at least Stephens and Wells were involved in the operation from its very inception, that is, prior to the abortive trip to Miami in search of a smuggling boat. Of course, this fact alone would doubtless not support a finding of a single, ongoing conspiracy. However, the evidence indicates that the original conspirators (Malloch, Durden, Farris, Wells, and Stephens), when the plan was first conceived, intended to set up a regular smuggling operation rather than to undertake a one-shot smuggling venture. Durden, who testified as a prosecution witness, stated that the original conspirators at their first meeting "were talking about the possible ways that we could bring in marijuana. We discussed using a boat to bring it in and a possibility of bringing it in by one of the commercial airlines." When both of these methods for smuggling proved unfeasible, the conspirators decided to undertake the operation by means of a private aircraft.

Thomas Malloch, Jr., later testified substantially to the same effect with regard to the intentions of the original conspirators. When asked by the prosecuting attorney about their discussion as to the purpose of the trip to Miami, Malloch replied, "This particular trip we were going down about trying to get a boat or about the best operation to get going."

"Get going for what?" Answer: "For marijuana."

Finally, as to this same discussion, Wells, on direct examination, testified as follows:

"Q: Did you talk with Durden and Mr. Farris and Mr. Stephens?

A: Yes, I did.

Q: What did you say that evening?

A: We were mainly concerned with the smuggling of marijuana—a plan to smuggle marijuana.

Q: From where, sir?

A: Jamaica.

Q: And do you recall any of the particular things that you said that night?

A: It was just general conversation about how to do it and what we should do . . . ."

In view of the foregoing we think it unnecessary to quote further from the extensive testimony in the trial transcript which likewise supports the government's theory that the original plan was to set up a marijuana smuggling operation, not limited to a single trip, from the Caribbean to the United States. We note that Stockmar, the owner and operator of a private aircraft, was enlisted into the conspiracy when it became apparent to the original conspirators that smuggling by means of boat or commercial airline was unworkable. Jones was added to the roster when it was decided by the participants to enlarge the operation by converting to a two plane system. That neither was a participant at the time the original scheme was concocted does not vitiate their convictions on the conspiracy count. As this court said in Nelson v. United States, 415 F.2d 483, 486 (5th Cir. 1969):

"It is not necessary, however, that a defendant enter into the unlawful agreement at its inception. [Citation omitted]. Likewise, if a person later joins an already formed conspiracy knowing of the unlawful purpose, he may be held responsible for the acts done in furtherance of the conspiracy, both prior and subsequent to his joinder."

Appellants next contend that it was error for the trial court to admit into

evidence, as bearing on the conspiracy count, the approximately 850 pounds of marijuana seized by law enforcement officers at Sebastian Airport in Florida on June 14, 1971. The basis for this contention is that the admissibility of this physical evidence was predicated on Wells' ability to identify the Sebastian Airport as the airport at which the June 14th marijuana drop had been made. Initially Wells was unable positively to recall at which airport the marijuana had been dropped and the court, as a consequence, refused to admit the marijuana into evidence. In order to rectify the situation the government sought leave of court to take Wells to the airport area and allow him to view it for the purpose of refreshing his recollection. The court granted this request on the condition that the Assistant United States Attorney who was prosecuting the case alone would accompany Wells on the trip. However, the government attorney did not do so; rather, Wells was taken to the airport area by a customs agent, Robert Austin. Appellants urge that this constituted an intentional violation of the sequestration rule and that as a consequence the marijuana, which was the only marijuana actually introduced at trial, should have been suppressed.

█ We note, however, that following this incident the trial court conducted a voir dire hearing at which both Wells and Austin were thoroughly queried as to whether they had at any time during the trip discussed the pending case against Jones and Stockmar. Both denied that they had and the court concluded that none of the defendants would be prejudiced by the government's failure to adhere to the court's explicit instructions. Having carefully examined the transcript of the voir dire hearing, we are satisfied that the trial court did not abuse its discretion in allowing Wells thereafter to make a positive identification of the Sebastian Airport. See, e. g., Del Cristo v. United States, 327 F. 2d 208 (5th Cir. 1964).

On the basis of that identification the several hundred pounds of marijuana seized on June 14, 1971, at Sebastian Airport by law enforcement officers were admitted into evidence. As we have noted, this was the only marijuana actually introduced and admitted at trial and it was admitted solely as evidence bearing on the conspiracy charge. Inasmuch as the June 30th shipment of marijuana, which was the subject of the substantive charges contained in Counts 11 and 12 of the indictment, had allegedly been disposed of by the defendants, it was never introduced into evidence. Appellants contend that the government failed at trial to prove an essential element of the crimes charged in Counts 11 and 12, that is, that the substance involved was in fact marijuana.

█ Lacking the physical evidence the government undertook to prove this element of the crime by circumstantial evidence. Wells identified as marijuana the substance which was dropped at the Sebastian Airport and which was later seized by law enforcement officers. He then testified that this was the same substance as that which had been smuggled into the United States on June 30, 1971, and which formed the subject matter of Counts 11 and 12. Subsequent to his testimony the government introduced an expert witness, Sidney Waldhour, Jr., who testified that the Sebastian Airport substance was marijuana. Based on this evidence the trial court instructed the jury that it could consider Wells' ability to identify the Sebastian Airport substance as evidence of his ability to identify marijuana with respect to the substantive counts. Appellants urge that such testimony was incompetent and therefore inadmissible. We disagree.

Wells was subjected to thorough cross-examination with respect to his ability to recognize marijuana and while he admitted that prior to the smuggling operation he had had little experience with the substance, he did state that thereafter he had smoked it on two or three occasions and that he had exam-

ined the contents of each smuggled shipment after it had been brought into the country. These facts, together with the fact that he was able to identify the Sebastian Airport substance as marijuana—an identification substantiated by an undeniably expert witness—we think amply supported the trial court's acceptance of Wells' qualifications to testify on the subject; we thus perceive no abuse of discretion in the court's so doing and appellants' objection therefore, must be deemed as going to the *weight* of the evidence and not its admissibility.[4] United States v. Powell, 449 F.2d 335, 336 (9th Cir. 1971); cf. Ewing v. United States, 386 F.2d 10, 14 (9th Cir. 1967), cert. denied, 390 U.S. 991, 88 S.Ct. 1192, 19 L.Ed.2d 1299.

■■■ Stockmar next urges that he was improperly denied the opportunity to challenge administratively the classification of marijuana as a controlled substance prior to his trial.[5] Section 811, 21 U.S.C. of the Drug Abuse Prevention and Control Act provides that the Attorney General may initiate, of his own motion or on the petition of any interested party, proceedings to determine whether a particular substance should be added to or removed from any Controlled Substance Schedule. How-

ever, even if Stockmar had successfully petitioned the Attorney General to remove marijuana from the schedules of controlled substances, the indictment against him would nonetheless have been pending prior to such time and its validity, we think, would be unaffected by any subsequent alteration in the classification of marijuana. See 1 U.S.C.A. § 109; Rehberg v. United States, 174 F.2d 121 (5th Cir. 1949).

■■■ Both appellants urge that the specifications in the indictment and the statute (21 U.S.C. § 801 et seq.) upon which the indictment was based are unconstitutionally vague. It is argued chiefly that the statutory procedures for *administrative reclassification* of controlled substances are too indefinite and uncertain to be given constitutional sanction. The short answer to this contention is that Congress itself put marijuana in its current classification and thus the substance has never been administratively reclassified. Of course, the statutes under which Stockmar and Jones were indicted are quite specific as to the type of activity proscribed.

■■■ Stockmar next contends that the district court abused its discretion in denying the bulk of his pre-trial motions for discovery, including a motion

4. We would note, moreover, that the government was able to produce at trial extrinsic, albeit circumstantial evidence, exclusive of Wells' identification testimony, from which the jury might have inferred that the substance alluded to in Counts 11 and 12 of the indictment was in fact marijuana. See United States v. Agueci, 310 F.2d 817 (2nd Cir. 1962). For instance, the substance at issue, which was consistently referred to by the conspirators as marijuana or "grass," was later sold in Atlanta, according to Wells' testimony, for about $100,000. (Prior loads likewise had been sold for substantial sums in cash.) Additionally, we note that a customs agent testified at trial that he had seen Stockmar in the Bahamas on June 29 and that the aircraft which Stockmar was flying smelled of marijuana.

5. Following indictment, proceedings in Stockmar's case were handled initially by a visiting judge who granted Stockmar

a continuance of his case for the purpose of filing an administrative challenge to the classification of marijuana as a controlled substance. Later the case was reassigned to another judge who, upon further consideration, retracted the continuance and set Stockmar's case for trial. Stockmar cites our recent case of Stevenson v. Four Winds Travel, Inc., 462 F.2d 899 (5th Cir. 1972), for the proposition that where one judge of a United States District Court, while a case is on his calendar, renders a decision and makes a judicial order in such case, and thereafter the case is transferred to the calendar of another judge, the latter should respect and not overrule the previous decision and order. We do not question the wisdom of this time-tested rule. However, for the reason stated below we do not see how Stockmar could have been prejudiced by the court's action here. See Fed.R.Civ.P. 52(a).

for a bill of particulars, a motion for a list of prospective government witnesses, and a broad discovery motion for the disclosure of all evidence favorable to Stockmar (which was granted as of the close of the government's evidence). Stockmar, however, has not demonstrated any prejudice arising out of the denial of his motions for pre-trial discovery nor do we, having carefully searched the record, find any. Applications for relief under the rules of discovery is largely a matter committed to the sound discretion of the district court and in the absence of any showing that Stockmar was prejudiced by the district court's actions we decline to hold that there was an abuse of discretion here.

We have carefully considered the other errors assigned by appellants on this appeal and find them to be without merit. The judgments of conviction are therefore affirmed.