James Edwin STEPHENS, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 76–176–Orl–Civ–Y.

United States District Court,
M. D. Florida,
Orlando Division.

June 29, 1978.

Reber Boult, Jr., Atlanta, Ga., for petitioner.

Kendell W. Wherry, Asst. U.S. Atty., Orlando, Fla., for respondent.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

This cause is before the Court on the motion of James E. Stephens, a federal parolee, to vacate his judgment of conviction and sentence pursuant to 28 U.S.C. § 2255 (1970). On June 10, 1972, a jury sitting in Orlando, Florida, found Stephens guilty of conspiracy to import, importation and possession of marijuana. Stephens declined to perfect an appeal but now seeks to set aside his judgment of conviction and sentence on the ground that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment. The Court held an evidentiary hearing to fully develop the record on Stephens' Sixth Amendment claim and then took this case under advisement. For the reasons stated below the Court concludes that the motion should be denied.

## I. THE EVIDENCE

The gravamen of Stephens' Sixth Amendment claim is that he was denied the effective assistance of counsel because his privately retained lawyer's representation was hobbled by an impermissible conflict of interest. This conflict of interest resulted, Stephens maintains, from his attorney's representation of Bobby C. Wells, the government's chief witness—and Stephens' admitted co-conspirator—in related cases as well as in a guilty plea arising out of the charges in the Orlando indictment on which Stephens was convicted in this Court. In short, the alleged conflict of interest resulted from Stephens' counsel's simultaneous representation of Stephens and the prosecution's chief witness.

The facts bearing upon Stephens' claim are complicated. The story begins in 1970 when Stephens and his co-worker at Eastern Airlines in Atlanta, Bobby Wells, began discussing the feasibility of smuggling marijuana into the United States. Together the two planned an Atlanta-based smuggling operation. As their scheme developed others were recruited, and, finally, during 1970 and 1971, a number of marijuana runs to Jamaica were attempted.

Three separate criminal indictments grew out of these various smuggling operations—

two in Atlanta and one in Orlando.[1] The first indictment was handed down by a grand jury in Atlanta in September 1971, charging Wells, Stephens and two others with conspiracy to import and three related substantive offenses.

The second indictment was returned by an Orlando grand jury in October, 1971, again charging Wells, Stephens, and other with conspiracy and related substantive offenses. These charges stemmed from an air-smuggling incident which occurred while Wells and Stephens were out on bail and awaiting the return of the first Atlanta indictment. The final indictment was returned in Atlanta on February 9, 1972, charging Wells and others—but not Stephens—with additional conspiracy and importation charges.

Wesley R. Asinof, a Georgia criminal defense lawyer, was involved to one degree or another in all three of these criminal cases. His conduct as counsel in these matters is the principle issue in this § 2255 proceeding.

Asinof was Stephens attorney. He had acted as counsel for Stephens in previous criminal cases and when the first Atlanta indictment was returned it was Asinof to whom Stephens immediately turned for help. *It was on Stephens' advice and recommendation that the three other Atlanta defendants decided to consult Asinof.* At an initial office conference Asinof agreed to represent all four defendants for a lump sum payment.

Asinof was actively working on the Atlanta case when the Orlando indictment was returned. Stephens immediately retained him as defense counsel in that case as well. Wells, however, was by then negotiating directly with government prosecutors in Atlanta and was hoping to work out a plea agreement applicable to all of the pending charges. Consequently he did not retain Asinof as trial counsel in that case. But it is clear that Asinof was assisting Wells on the Orlando charges, insofar as he was helping him with the plea negotiations in Atlanta.

By the time the second Atlanta charges were made Wells had worked out—with Asinof's assistance—a comprehensive plea agreement with the government. Asinof's role in the second Atlanta case was thus a limited one, but he was clearly counsel of record for Wells and he represented him at the plea and sentencing.

Plea negotiations on behalf of Wells were initiated early in December 1971. At that time the trial of the first Atlanta indictment was scheduled for December 14, the Orlando case was still in its formative stages, and the indictment in the second Atlanta case had not yet been returned— though Wells knew that it was forthcoming.

Just prior to trial a bargain was struck. Wells would be allowed to plead guilty to one count of the first Atlanta indictment, to enter a Rule 20 guilty plea to one count of the pending Orlando indictment and finally to plead guilty to one count of the forthcoming second Atlanta indictment; all other charges would be dismissed. In addition, the government agreed to recommend a sentence of five years imprisonment on each count to run concurrently, so that Wells would face a maximum term of imprisonment of five years.

The plea agreement was honored by all concerned. Wells entered a plea of guilty to the Atlanta charge on December 13, a day before trial. On January 21, 1972 Wells entered a Rule 20 plea to the Orlando charge and finally on February 11, Wells entered a plea of guilty to the second Atlanta indictment. A sentencing date was set for all three of the charges and thereafter continued until after the Orlando trial of Stephens and the other defendants was completed.

On August 25, after the Orlando trial, Wells was finally sentenced, receiving a term of five years on each of the three charges, to run concurrently as agreed.

---

1. With remarkable candor Stephens unequivocally admits his guilt of these charges. Apparently his theory of post-conviction relief is that the Constitution nevertheless entitles him to a second chance to convince the jury that he is innocent.

The remaining counts of the indictment were dismissed on the government's motion.

Stephens did not fare nearly as well as his partner. He rejected a plea agreement proposed by the government and went to trial on both the Atlanta and Orlando charges. He was convicted in each case.

Wells turned out to be the star witness for the government in the Orlando trial, and it was his testimony that sealed Stephens' fate. As the Court of Appeals observed in *United States v. Jones*[2], 480 F.2d 954 (5th Cir. 1973), it was largely on the strength of Wells' detailed and lengthy account of the marijuana schemes that Stephens and his co-defendants were convicted. Wells veracity as a witness was the crucial issue in the trial and defense counsel, including Asinof, were forced to devote many hours of cross-examination in attempting to discredit him.

During the trial Wells admitted on cross-examination that he had secretly intended to testify from the moment he entered his plea and that he expected his testimony to be of assistance to him in sentencing. The testimony of Elijah Jernigan, a defense lawyer, suggests that Wells' reasons for testifying were far more substantial than a general expectation of favorable treatment. According to Jernigan, Wells told him just before trial that he was going to have to testify for the government because if he did not the Atlanta prosecutor, Robert Smith, would see that he got fifteen years rather than five. In addition, the government's motion to postpone sentencing of Wells until after the Orlando trial suggests that the prosecution did not wish to recommend the promised concurrent sentences until it had obtained the expected testimony from Wells.

The evidence available to the Court suggests that Asinof was not privy to this understanding. Asinof did testify however at the 2255 evidentiary hearing that he suspected that Wells would testify and his suspicion grew as the time for trial drew nearer.

In fact, whether Wells would testify was a prominent subject of concern between Stephens and Asinof, as well as among the other co-defendants and their counsel. Stephens, it is clear, had no personal knowledge of Wells' intentions but he knew that Wells had struck a good bargain and he also was suspicious. Stephens and Asinof discussed the possibility of Wells testifying on a number of occasions. But at no point did they discuss the conflict of interest that might arise if Wells did in fact take the stand.

Wells, it should be noted, was doing his best to keep the Orlando defendants in the dark. On more than one occasion he assured Stephens that he would not turn "state's evidence" and he once fabricated a story about a planned marijuana run to Mexico in order to leave Stephens with the impression that he was still on his side. Similar representations were apparently made to the other defendants.

Nevertheless Asinof certainly knew by the time of trial, at the latest, that there was a very great likelihood that Wells would testify and hence that he would be faced with the dilemma of discrediting a client on the witness stand. The Atlanta and Orlando government prosecutors almost certainly knew as much. Neither the government nor the defense counsel however ever informed the court, and Stephens was never advised that the retention of other defense counsel might be appropriate.

It did not become apparent to the Court, having never been advised by counsel of the matter, that Asinof might have a conflict of interest until Asinof—in the middle of the trial—began a detailed cross-examination into Wells' plea agreement and Asinof's role in bringing it about. At that time the Court briefly questioned Asinof about the status of his representation. Asinof indicated that he had been Wells' counsel in the Atlanta case but that he was not currently acting as his attorney.

This statement was not completely accurate because even though Asinof may have

---

2. A co-defendant who did appeal.

avoided dealings with Wells after the guilty pleas had been entered, he technically remained Wells' attorney. The plea negotiations in which he played a role concerned all three of the criminal cases—including the Rule 20 plea on the Orlando charges. Moreover, *after* the Orlando trial Asinof appeared as Wells' counsel at the combined sentencing. He most certainly knew during the Orlando trial that he would be attending that sentencing hearing. Asinof's statements were—under even the most favorable interpretation—innocently misleading.

On the basis of this representation, and in the absence of objections from the government, the Court did not inquire further into the status of Asinof's representation. The trial proceeded with Asinof as Stephens' counsel. And it was not until the evidentiary hearing on the § 2255 motion—years later—that the court first learned of the extent of Asinof's professional relationship with Wells.

## II. THE CONFLICT OF INTEREST

■ The question raised by Stephens' motion is whether, on the above facts, he was deprived of the effective assistance of counsel guaranteed by the Sixth Amendment. Resolution of this question requires a three-step inquiry. First, was there a genuine conflict of interest? Second, if so, did Stephens waive his right to effective counsel? If not, was the conflict of interest of sufficient gravity that reversal of Stephens' conviction is required?

It seems clear enough on these facts—as counsel for the government appeared to concede—that a genuine conflict of interest was created by Asinof's representation of Stephens during the Orlando trial. For at the time of the trial Asinof's representation of Wells had not formally ceased. The bulk of his work had, of course, come to an end; Wells had already pleaded guilty to the various charges pending against him.

Nevertheless, Asinof was still Wells' attorney, because he remained obligated to appear at the sentencing hearing and insure that the plea agreements were honored.

Despite this continuing professional relationship, and the knowledge that Wells would in all probability take the stand against his former partner in crime, Asinof chose not to withdraw as Stephen's counsel. By appearing at the Orlando trial on Stephens' behalf he necessarily placed himself in the position of attempting to cross-examine Wells without intruding into matters subject to the attorney-client privilege.[3] Indeed, when pressed by the court for an explanation, Asinof acknowledged that he was laboring under a conflict of interest and that his professional loyalty to Wells precluded him from inquiring into privileged matters.

It is likewise clear that Stephens never waived his Sixth Amendment right to the effective assistance of counsel. Asinof was, of course, Stephens' counsel of long standing; *Wells retained him merely because of* Stephens' favorable recommendation. Further Stephens knew that there was a high probability that Wells would testify against him.

Under the circumstances it would appear that Stephens was consenting to a situation which he brought about. But technically it cannot be said that Stephens formally—on the record—specifically waived his constitutional claim under the Sixth Amendment. So further analysis is required.

This brings us to the final and dispositive question: Was the conflict of interest created by Asinof's representation of Wells of sufficient gravity to deny Stephens the assistance of counsel? It is urged that this inquiry need proceed no further than the finding of a genuine conflict of interest. Relying upon the seminal decision of *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941), Stephens argues that the existence of a conflict, without

---

**3.** However, as noted on Page 1210 herein, Asinof testified under oath that there were no "privileged matters" which inhibited full and complete cross examination. As a matter of fact, most of Wells' conferences with Asinof (prior to the plea negotiations) were in the presence of Stephens.

more, is all that is required to establish a claimed denial of the Sixth Amendment right to effective assistance of counsel. Under Stephen's view of the Sixth Amendment decisions, the prejudice which a defendant may or may not have suffered, and the substantiality of the evidence of his guilt, are irrelevant concerns for a reviewing court because prejudice is to be presumed from the finding of a conflict.

Though Stephens is correct in asserting a per se standard of ineffective assistance often governs in the conflict of interest cases, it would nevertheless be inappropriate to apply that standard here. For there are several salient factors which logically distinguish Stephens' undifferentiated claim of a Sixth Amendment deprivation from the decisions which have employed per se standards.

An analysis of Stephens' contention must begin with the recognition that there are two analytically distinct classes of cases in which a "conflict of interest" poses a risk of some kind to the quality of defense counsel's representation of a criminal defendant: the concurrent representation case, in which defense counsel has a simultaneous professional relationship with the defendant and either a witness or a co-defendant; and the former representation case, in which counsel's relationship to a witness ceased prior to trial. As will be seen below, only the former present a sufficient risk to the quality of counsel's representation to warrant the application of a per se rule.

CONCURRENT REPRESENTATION: THE NEED FOR A PER SE RULE OF INEFFECTIVE ASSISTANCE

*Glasser v. United States, supra,* typifies the kind of concurrent representation case most deserving of per se treatment. There, a federal trial judge required an attorney to represent two codefendants whose interests were clearly in conflict. The judge's order was rendered during the heat of trial when one of five codefendants, Kretske, dismissed his attorney. Over vigorous objections on conflict of interest grounds, the court appointed Glasser's privately retained attor-

ney to represent Kretske. Finding that a genuine conflict of interest was created by the appointment, the Supreme Court reversed Glasser's conviction, reasoning that "the 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." 315 U.S. at 70, 62 S.Ct. at 465.

The *Glasser* case presented compelling reasons for the application of a per se standard of review. The conflict of interest between Glasser and Kretske was apparent and made known to the trial judge. There was evidence in the record which demonstrated that counsel was restricted in cross-examination, because of his "struggle to serve two masters" 315 U.S. at 75, 62 S.Ct. 457. The trial judge thus had a very direct role in diminishing the quality of defense counsel's representation of Glasser, a fact perceived to be of crucial importance by the court:

"Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting, that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court." 315 U.S. at 71, 62 S.Ct. at 467.

Under these circumstances the court refused to inquire into the degree of prejudice sustained, remarking:

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. A right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 315 U.S. at 75–76, 62 S.Ct. at 467.

The per se rule applied in *Glasser* was reaffirmed in *Holloway v. Arkansas,* 435

**1208**

U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). In that case the state court appointed a public defender to represent three codefendants charged with robbery and rape. Prior to trial defense counsel moved for the appointment of separate counsel, claiming that because of confidential information received from the codefendants, he was confronted with the risk of representing conflicting interests and thus could not provide effective assistance to each of his clients. The trial judge denied the motion without conducting an inquiry into the validity of these allegations. Before the jury was empanelled the defense attorney renewed his request, but the trial court persisted in its refusal to either appoint counsel or to ascertain whether the risk to the quality of counsel's representation was sufficiently grave to warrant such appointment.

On appeal the Supreme Court reversed the resulting convictions, holding that "the failure [to appoint counsel or to determine the need for appointment] in the face of the representations made by counsel weeks before trial and again before the jury was empanelled, deprived petitioners of the guarantee of 'assistance of counsel.'" 435 U.S. at 484, 98 S.Ct. at 1179, 55 L.Ed.2d at 434. As had the court in *Glasser,* the *Holloway* court refused to require a specific showing of prejudice. The Court reasoned that whenever a trial judge either permits or requires joint representation of codefendants alleged by counsel to have conflicting interests without conducting a hearing to determine the true facts, reversal of the conviction is required, even absent proof of material prejudice to the defense.

■ The *Glasser* and *Holloway* decisions, narrowly construed, authorize a per se standard of review only where the trial court has played an instrumental role in a conflict of interest affecting appointed counsel's representation—either by compelling counsel to undertake the defense of codefendants whose interests are in conflict or by permitting a conflict-ridden representation to continue after being placed on notice of

the problem. But the lower federal courts have not so limited the application of the per se rule in the concurrent representation context. Thus we find unanimous agreement in the circuits that even where the trial judge is not sufficiently placed on notice of the conflict—and thus has no direct role in the matter—reversal is automatic upon a finding of a genuine conflict of interest which affects the quality of appointed counsel's representation of codefendants. *See, e.g. Gravitt v. United States,* 523 F.2d 1211 (5th Cir. 1975); *United States ex rel. Hart v. Davenport,* 478 F.2d 203 (3rd Cir. 1973); *Austin v. Erickson,* 477 F.2d 620 (8th Cir. 1973); *Holland v. Henderson,* 460 F.2d 978 (5th Cir. 1975); *Walker v. United States,* 422 F.2d 374 (3d Cir. 1970); *Baker v. Wainwright,* 422 F.2d 145 (5th Cir. 1970); *White v. United States,* 396 F.2d 822 (5th Cir. 1968); *United States v. Gougis,* 374 F.2d 758 (7th Cir. 1967); *Sawyer v. Brough,* 358 F.2d 70 (4th Cir. 1966).

The same per se standard has frequently been applied where the conflict originates not from the concurrent representation of co-defendants with conflicting interests, but from the fact that defense counsel has an on-going attorney-client relationship with an important prosecution witness. *See, e. g., Porter v. United States,* 298 F.2d 461 (5th Cir. 1962) (defense attorney also attorney for police officer who was chief prosecution witness); *Taylor v. United States,* 96 U.S.App.D.C. 379, 226 F.2d 337 (1955) (defense counsel represented government informer); *District of Columbia v. Scott,* 94 U.S.App.D.C. 227, 214 F.2d 860 (1954); *United States ex rel. Williamson v. LaVallee,* 282 F.Supp. 968 (E.D.N.Y.1968) (attorney represented chief prosecution witness who was under indictment); *United States ex rel. Miller v. Myers,* 253 F.Supp. 55 (E.D. Pa.1966) (defense counsel represented victim in a burglary case).

■ In the concurrent representation context the courts have consistently adhered to a per se standard of review. The result is the same whether counsel is privately retained or appointed, whether the

judicial involvement in the conflict is considerable or nonexistent, and whether the conflict concerns co-defendants or a criminal defendant and a chief prosecution witness. All that is required for a reversal of the conviction in these cases is the showing of a genuine conflict posing a realistic risk to the quality of counsel's representation of the complaining defendant.

## FORMER REPRESENTATION: THE NEED FOR A SHOWING OF PREJUDICE

■ A different rule governs in the former representation case, that is, where counsel's relationship to a prosecution witness has come to an end prior to the trial. The conflict of interest claim in this context must be predicated upon counsel's past attorney-client relationship with the witness, rather than upon certain continuing professional loyalties that would obviously exist if the relationship were still an ongoing one. The difference in the nature of the Sixth Amendment claim asserted is an important one. In the concurrent representation case the conflicting loyalties and the consequent risk of prejudice are manifest; in the former representation case, on the other hand, the possibility of prejudice is far less likely, depending largely upon two factors: counsel's interests in possible future representation of the previous client [4] and the relevance to the cross-examination of any privileged information that counsel might have acquired as a result of their past professional relationship. Only a fact-finding hearing can resolve these issues, and for that reason the courts have rejected the application of the per se rule.

■ Where the consequences of an activity are highly dependent upon the facts and the motivations of the participants per se standards are obviously inappropriate measures of legality. There must be a considered inquiry into the particular circumstances to "determine whether counsel's undivided loyalties reside with his current client." *United States v. Jeffers,* 520 F.2d 1256, 1264 (7th Cir. 1975) (per Stevens, J.), *cert. denied* 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976). It is only when the defendants can demonstrate that they are not, and thus that he is genuinely prejudiced, that a Sixth Amendment claim will be made out. *See Haggard v. State of Alabama,* 550 F.2d 1019, 1022 (5th Cir. 1977); *United States v. Jeffers, supra; United States v. James,* 505 F.2d 898 (5th Cir. 1974), *cert. denied* 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667; *United States v. Donatelli,* 484 F.2d 505 (1st Cir. 1973).

## STEPHENS' SIXTH AMENDMENT CLAIM

Because of its rather peculiar facts, the present case does not fit neatly within either of the two broad categories of conflict cases discussed above. In its most technical sense, this is a concurrent representation case because Asinof retained a lawyer-client relationship with Wells throughout the course of the Orlando trial and thereafter until his sentencing on the three criminal charges. At the time of his cross-examination of Wells, then, Asinof was forced into the position of attacking the credibility of one current client in order to defend another. It is for this reason that Stephens maintains that the per se rule of *Glasser* and its progeny applies here.

But there are undeniably attributes of the former representation case present here as well. For if one looks beyond mere form to the substance of the relationship, it is clear that Asinof's representation of Wells had essentially come to an end well before the Orlando trial. Asinof's "work" on Wells' behalf consisted of three activities: assisting Wells in securing a favorable plea agreement, attending the ensuing re-arraignment hearings to see that the pleas were properly consummated, and attending the sentencing hearings at which Wells was sentenced in accordance with the plea bargains. The first two activities, which con-

---

**4.** Compare *Zurita v. United States,* 410 F.2d 477 (7th Cir. 1969), where the defendant alleged that his attorney had an ongoing relationship with the bank that he had been convicted of robbing.

stituted the real substance of Asinof's representation, took place prior to the Orlando trial. From the time of the last plea to the sentencing hearing, which took place after Stephens' conviction, Asinof had no out of court contact with Wells. As far as he was concerned his duties to Wells were completed; the case was closed. Asinof accordingly directed his post plea efforts to preparing a defense for Stephens.

Bearing as it does earmarks of both categories of conflict cases, it seems advisable to dispense with labels and decide this case on its own unique facts, focusing on the extent to which the Sixth Amendment concerns underpinning the per se rule are implicated here. It is necessary to inquire, in short, whether the risk to the quality of counsel's representation under the facts of this case were sufficiently grave to require the application of a per se rule.

■ As we have seen, where the conflict of interest arises from the simultaneous attorney-client relationship with the defendant and an important prosecution witness, the Sixth Amendment concerns are twofold: the ability of defense counsel to effectively cross-examine the client witness, and the ability of a reviewing court to assess with some degree of reliability the extent to any prejudice resulting from this dual relationship.

Turning to the first concern, experience suggests two factors bearing on the ability of counsel to effectively cross-examine a client witness: first, the nature and strength of counsel's interest—financial or otherwise—in continuing the relationship. Second, the existence of privileged matters the knowledge of which preclude counsel from pursuing some line of inquiry material to the defense.

■ The concurrent representation cases have dealt explicitly only with the first factor. Where the relationship is truly ongoing and the attorney is obviously interested in the continued representation of the witness, the inquiry need proceed no further. Counsel's divided loyalties may be presumed to be so intolerable that an effec-

tive cross-examination is impossible. Where, however, the attorney-client relationship between witness and counsel is not truly an ongoing one, but is a mere formality lacking true substance, it would be a mistake to *presume* that counsel's ability to cross-examine is significantly affected. Lacking interest or expectation in future business with the client/witness, the defense counsel should in most cases be able to act effectively as an advocate of the defendant. Such is the case here. At the time of the Orlando trial, Asinof's representation of Wells had effectively ended, he had no further interests financial or otherwise in any future representation of Wells, and he had intentionally shut-off all communication with Wells in preparation for Stephens' defense. Under these circumstances some factual basis for inferring that Asinof's cross-examination was ineffective because of the relationship with Wells should be required. There is simply no reason to presume from the nature of the relationship between Wells and Asinof at the time of the Orlando trial that Asinof's effectiveness as Stephens' advocate was necessarily compromised.

A similar conclusion is warranted with respect to the second factor—the existence of confidential information material to the defense. It cannot logically be inferred that counsel's ability to cross-examine is impaired merely because he may be in possession of privileged matters. There must be some basis in the record for concluding that the privileged information *in fact* precluded the defense attorney from inquiring into relevant matters. There is clearly no basis for such conclusion here, for Asinof testified at the court's evidentiary hearing on August 27, 1977 that his cross-examination of Wells was not hindered by his knowledge of privileged information. That testimony is unrefuted.

Under the rather unique circumstances of this case, then, there is no basis for the application of a per se standard of review. Asinof's lack of interest in further representation of Wells, the formal rather than substantive nature of their relationship at the time of the Orlando trial, and the ab-

sence of privileged information which would have prevented Asinof from inquiring into legitimate areas of concern, all suggest that there is simply no reason for presuming prejudice to the quality of counsel's representation. Nor is there reason to presume that a reviewing court would be unable to assess the prejudice, if any, to Stephens resulting from the technical conflict involved here. Accordingly, Stephens should be put to the burden of proving that the conflict of interest of which he complains genuinely hindered the quality of Asinof's cross-examination of Wells to the extent that he suffered *some* prejudice.

The question thus becomes whether Stephens has satisfied that burden. It is clear that he has not. The trial record and the evidence adduced at the court's evidentiary hearing demonstrates that Asinof's representation of Wells was as effective and vigorous as any defense lawyer's could have been under the circumstances. The evidence of Stephens' guilt, not only as a marijuana smuggler and conspirator but as the ringleader of the conspiracy, was overwhelming. Much of this unfavorable testimony, to be sure, came from the mouth of Stephens' former partner in crime—Wells. But an analysis of Asinof's cross-examination and the evidence produced at the evidentiary hearing demonstrates that Asinof gave Wells no quarter. Asinof knew that Wells' testimony, if believed by the jury, would seal the fate of Stephens, and he devoted much effort to attempting to discredit him. Because of his detailed knowledge of Wells' plea agreements with the government, Asinof was in a unique position to attack Wells' credibility, and he exploited that position to the fullest—probing deeply into the aspects of the plea agreement and Wells' motivations for testifying in favor of the government, even to the point of inquiring into matters that he could have learned only as a result of his representation of Wells.

There is simply no basis on this record, then, for concluding that Asinof's representation of Stephens was affected materially by the technical conflict of interest created by his relationship with Wells. It was, of course, improper for Asinof to continue his representation of Stephens, once he was aware that Wells would probably testify, without obtaining the express approval of his client. But it cannot be said that this impropriety deprived Stephens of his Sixth Amendment right to the effective assistance of counsel. Stephens has shown no actual prejudice and because, under the facts of this case, he is not entitled to have his conviction vacated solely because of Asinof's prior active and then current inactive representation of Wells, the petition should be denied.

### THE DOUBLE JEOPARDY CLAIM

Stephens' second claim of constitutional error requires much less analysis. The gravamen of his constitutional claim is that his conviction in this court infringed his right under the double jeopardy clause of the Fifth Amendment not to be "twice put in jeopardy" for the same offense because the Orlando conviction was the second time he has been convicted for the same conspiracy. In essence, Stephens argues that he and Wells were involved in one continuing conspiracy to import marijuana throughout the time of their criminal activities and that the Georgia indictment under which he was first convicted and the Orlando indictment concerned the same conspiracy.

█ In light of the fact that Stephens abandoned his appeal from the Orlando conviction, it is arguable that he has likewise abandoned any right to seek Section 2255 relief for this double jeopardy claim. For Stephens offers no reasons for his dismissal of the appeal. *See generally Sosa v. United States,* 550 F.2d 244, 246–249 (5th Cir. 1977). But even if Stephens is entitled to have the merits of this claim addressed, it is clear that he is entitled to no post conviction relief. The record amply demonstrates that the Georgia and Orlando indictments concerned two separate and distinct conspiracies which were punishable as separate crimes.

## CONCLUSION

Finding no merit to either of Stephens claims of constitutional deprivation, the court will enter judgment in favor of the respondent.