Peurifoy STEVENSON, Plaintiff-Appellant,

v.

FOUR WINDS TRAVEL, INC., and Peter Frank Tiarks, Defendants-Appellees.

No. 71–3003.

United States Court of Appeals, Fifth Circuit.

June 19, 1972.

Frederick B. Hart, W. S. Holland, Miami, Fla., Bradford, Williams, McKay, Kimbrell, Hamann & Jennings, P. A., Miami, Fla., for plaintiff-appellant.

Henry Burnett, Miami, Fla., Fowler, White, Humkey, Burnett, Hurley & Banick, P. A., Miami, Fla., of counsel, for defendants-appellees.

Before PHILLIPS,* THORNBERRY and RONEY, Circuit Judges.

PHILLIPS, Circuit Judge:

On June 25, 1970, Peurifoy Stevenson commenced this action in the United States District Court for the Southern District of Florida against Four Winds Travel, Inc., a Florida corporation, and Underwriters at Lloyd's, London,[1] to recover damages for personal injuries suffered while she was a member of a group on a tour of South America, which was conducted and directed by Four Winds.

On November 2, 1970, the case was transferred from the calendar of Honorable William O. Mehrtens, a judge of the United States District Court for the Southern District of Florida, to the cal-

---

* Of the Tenth Circuit, sitting by designation.

1. On motion of Peter Frank Tiarks that he be substituted as a party defendant for Underwriters at Lloyd's, London, and agreed to by the stipulation of the parties, he was so substituted.

endar of Honorable James Lawrence King, also a judge of such court.

On December 28, 1970, and with leave of court, Stevenson filed an amended complaint containing four counts. The claim asserted in Count I was predicated on the alleged negligence of Four Winds. The claim asserted in Count II was predicated on alleged breaches of contract by Four Winds. The claim asserted in Count III was predicated on an alleged breach of an express warranty made by Four Winds to Stevenson, and the claim asserted in Count IV was predicated on an alleged breach of an implied warranty made by Four Winds to Stevenson.[2]

Four Winds filed motions to strike Counts II, III and IV and to dismiss such

2. The amended complaint in part alleged:

"2. Four Winds Travel, Inc., is a professional travel organization which specializes in group cruises and tours around the world, including South America, for a public at large. Certain local travel agents in their particular locality maintain brochures and other advertising material furnished to them by the Defendant describing the various tours offered, including the itinerary, cost involved, and so forth.

"3. Prior to December 28th, 1967, the plaintiff contacted the Carolina Motor Club, Inc., in Columbia, South Carolina, and was shown travel brochures and other advertisements which were prepared and distributed by the defendant. Thereafter, the plaintiff chose the defendant's 47-day South American Tour. After determining then from the defendant that space and accommodations were available, the Carolina Motor Club, Inc., on behalf of the defendant, and while acting as agent and representative of the defendant, contracted with the plaintiff for the said tour and collected from the plaintiff the necessary funds for the cost of said tour, said funds amounting to TWO THOUSAND SEVEN HUNDRED FORTY–FIVE AND NO/100 ($2,745.00) DOLLARS.

"4. That among other things, the plaintiff was led to select the defendant's travel servicing tour by virtue of the representations and statements made in the defendant's printed brochures * * *."

We hereinafter refer to and set out the statements and representations on which Stevenson relied.

"5. At all times material hereto, the plaintiff acted in complete reliance on the representations and statements outlined in defendant's printed brochures * * * as well as the representations made to plaintiff by the Columbia [Carolina] Motor Club, Inc., on behalf of the defendant. At no time, while plaintiff was on the said tour, did the defendant, its agents or representatives, do anything to lead plaintiff to believe that they were not in full and complete charge of the said tour.

"6. On or about the 28th of December, 1967, the plaintiff commenced the 47-day tour of South America which had been arranged by the defendant. On February 2nd, 1968, near Manaus, Brazil, a boat under the direction and control of the defendant and/or its agent and representative, Selvatur, a Brazilian tour agency, which had been selected by the defendant, stopped at a boat landing, dock or wharf on the Rio Negro River, believed to be under the control of the defendant and/or Selvatur. At that time, other members of the defendant's tour, including the plaintiff, were allowed to disembark upon the said landing, dock or wharf. After disembarking from the defendant's boat, the plaintiff went to walk upon the said landing, dock or wharf, and, as she did so, her foot slipped on a board which contained a slimy and slippery substance proximately causing her to fall and sustain severe and permanent injuries and other damages as hereafter alleged. Said substance was not known or readily ascertainable by the plaintiff, but was known or should have been known by the defendant and/or Selvatur.

"7. At all times material hereto, the defendant had a non-delegable duty to the plaintiff to see that the said tour was conducted in a manner as outlined in the defendant's printed literature and the oral representations made to the plaintiff by the Columbia [Carolina] Motor Club, Inc.

"8. Having allowed the Columbia [Carolina] Motor Club, Inc., to distribute and display its printed literature and to contract and accept money on its behalf, the defendant is estopped to deny that the Columbia [Carolina] Motor Club, Inc., acted as its agent and representative at all times material hereto * * *."

counts on the ground that they did not state a claim upon which relief could be granted.

On February 18, 1971, Judge King entered an order striking and dismissing Counts II and IV and denying the motions as to Count III.

The facts hereinafter stated are taken from the deposition of Stevenson, taken by Four Winds for discovery purposes on October 1, 1970, and the deposition of Sadie A. Kasdan, a member of the party on the tour here involved, taken by Four Winds for discovery purposes on December 7, 1970,[3] and defendants' Exhibit No. 1, a brochure which was attached to the deposition of Stevenson and filed in the records of the United States District Court for the Southern District of Florida on October 1, 1970, as shown by the stamp thereon of the Clerk of the District Court, and sent up as a part of the record on this appeal.

Stevenson was a qualified and experienced school teacher. She quit teaching during the depression of the 1930's and entered the service of the United States Government, because the pay was higher than she was receiving as a teacher. She received promotions and reached the point in her government service where it was advantageous, because of other benefits, to remain in such service. She reached the age of 58 on October 23, 1967, and the following day she retired from government service. She had two older sisters who had theretofore retired. The three sisters decided to take a tour to celebrate Stevenson's retirement. They went to the Carolina Motor Club, Inc., located in Columbia, South Carolina, and obtained such brochure. They examined it. It described a 47-day tour to South America and two other tours to South America. After examining the brochure and the description of the 47-day tour and other representations made in the brochure, they decided to take the 47-day tour. They advised Mrs. Stuckey of the Carolina Motor Club that they had decided to take the 47-day Four Winds tour. She made the necessary arrangements for them with Four Winds. After Mrs. Stuckey had been advised by Four Winds that there was an opening on such tour for three other persons, Mrs. Stevenson and her sisters each paid to Mrs. Stuckey the $2,745, which was the fare or charge for such tour, and Mrs. Stuckey remitted it to Four Winds. Thereafter, they received information and instructions from Four Winds and also from Mrs. Stuckey. They were advised by Mrs. Stuckey that their flight bags and airplane tickets had arrived from Four Winds and they picked them up. They also received a letter from Four Winds, saying it was glad to welcome them as members of the South American tour and enclosing an itinerary of the tour and a mailing list showing where they would be on certain dates.

The tour commenced at Miami, Florida, and went to Bogota, Columbia. The tour was accompanied by Carlos Ceijas, who was the escort and director on the tour for Four Winds. They turned the airplane tickets and other things over to him.

The brochure was prepared and copyrighted by Four Winds, and Four Winds sent it to a number of local travel agencies, including the Carolina Motor Club.

At this point, we will set out some of the representations made by Four Winds with respect to the 47-day tour, as follows:

"How to Make a Reservation for your Four Winds Tour.

"1. Read this brochure carefully and choose the tour which best suits your interests, your vacation time and your budget.

"2. *Contact your local travel agent or Four Winds and have an expert*

---

3. The deposition of another passenger, George Pevan, was taken for discovery purposes by the defendants. In many respects, it confirmed the testimony of Stevenson. In others it was in conflict with the testimony of Stevenson. Such conflict only created disputed issues of material facts and is not here important.

*help you with your final plans and answer any questions you might have.* (Italics ours.)

"3. Make your reservation. A deposit of $100 per person is required to secure your place on the tour you want."

The statement in paragraph No. 2, supra, clearly implies, we think, that the reservation could be made through the local travel agency. We continue to quote:

"Four Winds also guarantees that every tour will be escorted by a qualified professional tour director. Our directors have been carefully selected and trained * * *.

"Your Four Winds jet tour is an escorted tour. *From the moment you leave until your journey ends you are cared for by a carefully selected Four Winds Tour escort.* Our escorts are mature, resourceful and travelwise, and when you're traveling both on and off the beaten track, it is reassuring to know that they are leading the way for you. Some of the Four Winds tour escorts have traveled over a million miles around the world. It's this type of globe-girdling experience that means important, extra satisfaction for you. (Italics ours.)

\* \* \* \* \* \*

"Your escorts are also informative. They know precisely what you will be seeing and doing every day. After all, they've been there before. They can tell you where the shopping is best, what to wear, when and where to change currency, anything at all. They know all the answers.

"Your Local Guides (Four Winds Overseas Family).

"No one knows a country like a native. So, to supplement the knowledge of your tour escort, we use professional local guides in the cities you visit. They know out of the way places the casual visitor may miss * * * adding another dimension to your trip with Four Winds."

The foregoing quotation justifies the implication that Four Winds employed local guides to assist Ceijas. We further quote from the brochure:

"Nine Good Reasons for Traveling With Four Winds.

"1. Guaranteed fully escorted from start to finish * * *."

After visiting 17 countries, the tour group reached Manaus, Brazil, on February 1, 1968. On the afternoon of that day, they went by bus on a sightseeing tour of the city, accompanied by Ceijas. They stopped at a Catholic school and were shown around by the Catholic sisters. During their trip through the school, a young boy came up and joined the group. The next day, they started the Amazon trip. Four Winds had arranged with a local Brazilian travel agency to furnish transportation for that part of the trip. The name of the agency was Agencia Selvatur, Ltds. of Manaus, Brazil. The name of the boy who joined the group was Bartholomew, and he was a guide for such local agency.

On the morning of February 2, 1968, at about 9:30, the tour group boarded a boat docked about three blocks from their hotel to make the Amazon trip.

The boat stopped and anchored near a pier on the Rio Negro River. The members of the group were transported from such boat by smaller boats to the pier. The pier had a walkway about three or four feet wide, extending out onto the water. The walkway was only a few inches above the water, and the water splashed over onto the pier on both sides thereof.

The purpose of the stop was to let the group visit a rubber plantation and see some giant water lilies. There was no gangplank available from the small boat to the pier and the members of the party on the small boat had to step down a distance of about three feet from the gunnel of the small boat to the pier. Ceijas and Bartholomew helped them down onto the pier. They lifted some of the passengers down.

After Stevenson reached the pier she walked about six feet or three steps and stepped onto the lower step of a stairway to let by the passengers behind her who wanted to see some native crafts and trophies in a room that adjoined the pier. As she did not want to look at the crafts or trophies, she remained on the step until the group assembled to go ashore and visit the rubber plantation. When the group was ready to go ashore, someone shouted "Come on, let's go." Stevenson then stepped down with her right foot to the walkway of the pier, and as her right foot reached such walkway it skidded from under her and she went down. She said she slipped like she had stepped on a banana peel. The fall resulted in a fracture of the right patella, the right tibia, and the right femur, and possibly other serious injuries to the upper portion of her spine. After she fell, she observed for the first time that the water was splashing over and onto the pier from both sides thereof, where it extended out onto the water, and that the water was slimy. The planks in the walkway were weather-beaten and were greatly worn. Stevenson was not warned by Ceijas or any other person that the pier was slippery and to be careful.

Mrs. Kasdan testified in her deposition that the pier was wet and muddy.

An affidavit filed by Peurifoy Stevenson's sister, Charlotte Stevenson, submitted in opposition to the motion of Four Winds for a summary judgment, which motion is hereinafter referred to, stated that the dock was wet and slippery in the area where Peurifoy fell, and that it was made so by an algae-like substance.

After the answer of Four Winds and Tiarks was filed, this case came on to be heard on their motion for summary judgment, and the court having considered the memoranda of law submitted by both parties, as well as all affidavits, pleadings, depositions and all other matters on file, and being otherwise advised in the premises, denied the motion. The order was dated July 15, 1971, and was filed on the same date with the Clerk of the United States District Court.

After the decisions and orders rendered and handed down by Judge King, and on July 16, 1971, the case was transferred from the docket of Judge King to the docket of Honorable Emett C. Choate, a judge of the United States District Court for the Southern District of Florida.

The case was set for trial before Judge Choate. Before it was called for trial, Judge Choate of his own volition stated in the presence of prospective jurors for the trial of the case that in his opinion Stevenson did not have a case against Four Winds, and that he would direct a verdict against Stevenson after she had presented her case. He further stated, "I agree that the other Judge did not agree with me."

In view of the position taken by Judge Choate, counsel for Stevenson decided to present her case by stipulation. It was then stipulated that if Stevenson's case was tried, it would consist of all the matters in the record, pleadings, depositions, affidavits, answers to interrogatories, requests for admissions, and all other evidentiary material. Counsel for defendants then moved for a directed verdict and the motion was granted. Judgment was entered on behalf of defendants, and this appeal followed.

From the foregoing, it will be seen that Judge Choate, on the identical record considered by Judge King, and on which Judge King held that the first and third counts stated a cause of action and denied a motion for summary judgment on the ground there were genuine issues as to material facts, reached a conclusion directly opposite to that reached by Judge King. That, Judge Choate clearly admitted by his statement quoted above. And Judge Choate, in directing a verdict for Four Winds on the identical record, in effect overruled Judge King's decisions and orders.

■ The rule in most of the national courts that have passed on the question is that where a judge of a United States District Court or a judge assigned to a United States District Court, while a case is on his calendar, renders a decision and makes a judicial order in such

case, and thereafter the case is transferred to the calendar of another judge of such District Court, the latter judge should respect and not overrule such decision and order.[4]

The reason for the rule was well stated by the late United States Circuit Judge Walter H. Sanborn in Plattner Implement Co. v. International Harvester Co., 68 Cir., 133 F. 376, at 378–379, as follows:

> " * * * the rule itself, and a careful observance of it, are essential to the prevention of unseemly conflicts, to the speedy conclusion of litigation, and to the respectable administration of the law, especially in the national courts, where many judges are qualified to sit at the trials, and are frequently called upon to act in the same cases. It is unavoidable that the opinions of several judges upon the many doubtful questions which are constantly arising should sometimes differ, and a rule of practice which would permit one judge to sustain a demurrer to a complaint, another of co-ordinate jurisdiction to overrule it and to try the case upon the theory that the pleading was sufficient, and the former to then arrest the judgment, upon the ground that his decision upon the demurrer was right, would be intolerable. It has long been almost universally observed. * * * "

■ Judge Choate should have respected and not attempted to overrule the decisions rendered and orders entered in the case by Judge King while it was on his calendar.

4. Plattner Implement Co. v. International Harvester Co. of America, 8 Cir., 133 F. 376, 378–379; Donnelly Garment Co. v. National Labor Relations Bd., 8 Cir., 123 F.2d 215, 220; Humphrey v. Bankers Mortg. Co. of Topeka, Kan., 10 Cir., 79 F.2d 345, 352; Travelers Indemnity Company v. United States, 10 Cir., 382 F.2d 103, 107; Price v. Greenway, 3 Cir., 167 F.2d 196, 199; DiFrischia v. New York Central Railroad Company, 3 Cir., 279 F.2d 141, 144; In re Joslyn's Estate, 7 Cir., 171 F.2d 159, 164.

However, the Ninth Circuit holds that the question of whether a United States

However, counsel for Stevenson stipulated that the evidentiary matter—depositions, affidavits, answers to interrogatories, requests for admissions, and all matters in the record before Judge King, reflected the facts he would prove at the trial, and argued at the hearing before Judge Choate that such facts would make a prima facie case for Stevenson and would entitle her to have submitted to the jury the disputed issues of material facts. Judge Choate decided against such contention, directed a verdict for Four Winds and Tiarks, and entered a judgment accordingly.

That being the posture of the case, we think it would expedite the final decision thereof and be in furtherance of justice if we decide the contention of Stevenson that by the record she made before Judge Choate she made out a prima facie case in support of her claim; that Four Winds was guilty of negligence; that such negligence was the proximate cause of her slipping and falling and the injuries she suffered as the result of such fall; that she was entitled to recover from Four Winds the damages she suffered by reason of such injuries; and if we decide her further contention that Judge Choate erred in directing a verdict against her at the end of her case in chief.

There was substantial evidence from which the jury could have found that the walkway of the pier, where it extended out into the water, was only a few inches above the surface of the water; that the water splashed onto the walkway, made it wet, and washed onto it loose growths of aqueous plants; that mud accumulat-

District Judge may review and overrule a judicial decision theretofore made in the same case by another United States District Judge is a matter of judicial discretion, and if a United States District Judge does overrule such a decision, the question is whether he abused his discretion in so doing. Castner v. First National Bank of Anchorage, 9 Cir., 278 F.2d 376, 379, 380. See also: Dictograph Products Co. v. Sonotone Corp., 2 Cir., 230 F.2d 131, 136.

ed on the walkway, no doubt from the water and the settling on it of dust from the air and dirt deposited on it by the footwear of persons using the pier; that the aqueous plants which washed onto the walkway mixed with the mud, and that such conditions made the walkway slippery and dangerous, unless extraordinary care was taken by a person walking thereon.

■ Four Winds was not the owner or lessee of the pier, nor did it have any control over it. Hence, Four Winds was not responsible for maintaining the pier in a safe condition.

Hence, the liability of Four Winds depends upon whether there was a duty on the part of Ceijas as the employee of Four Winds to warn Stevenson that the accumulation of water, aqueous plants, and mud on the walkway of the pier made it slippery, and to walk carefully on such walkway to avoid slipping, and whether Ceijas was guilty of negligence in not performing such duty.

■ By sending copies of the brochure to the Motor Club, Four Winds clearly authorized the Motor Club to distribute copies of the brochure to prospective tour customers of Four Winds.

In the brochure, Four Winds, under the heading "How to Make a Reservation for Your Four Winds Tour" stated:

"1. Read this brochure carefully and choose a tour which best suits your interests, your vacation time and your budget.

"2. Contact your *local travel agent* or Four Winds and have an expert help you with your final plans and answer any questions you might have. (Italics ours.)

"3. Make your reservation. A deposit of $100 per person is required to secure your place on the tour you want."

Such statement, we think, clearly showed that Four Winds authorized the Motor Club to answer any questions prospective tour customers had, to accept for Four Winds an application for a reservation and the deposit required, and forward them to Four Winds. That is also confirmed by the fact that Four Winds accepted the application and deposit and sent to the Motor Club for delivery to Stevenson the airplane tickets, the complimentary flight bag, and other material.

■ Under the law of Florida, the duty of Four Winds, acting through Ceijas, to so warn Stevenson could arise by virtue of the contractual relationship between Four Winds and Stevenson, the terms thereof, and the representations and statements made to Stevenson in the brochure.[5]

■ The representations and statements of Four Winds in the brochure, with respect to the services that would be rendered by Ceijas as tour director, were a part of what Four Winds obligated itself to do in the tour contract with Stevenson, and Stevenson had the right to rely thereon and did rely thereon.

The brochure stated:

"Four Winds also guarantees that every tour will be escorted by a qualified professional tour director. Our tour directors have been carefully selected and trained * * *.

"In order to insure the best possible personal service, Four Winds tour groups are limited to not more than 28 members.

"Your escorts (tour directors) are also informative, they know precisely *what you will be seeing and doing every day.* * * * they've been there before." (Italics ours.)

The brochure also stated that Four Winds guaranteed that each tour would be "fully escorted from start to finish."

The authority and duties of Ceijas as tour director were very broad. Four Winds admitted in its answer to Stevenson's Interrogatory No. 3: "The Tour Director assumes management of all matters pertaining to his tour."

The brochure further stated:

"From the moment you leave until your journey ends, *you are cared for* by a carefully selected Four Winds Tour escort." (Italics ours.)

One of the definitions of the word "care" in Webster's New International Dictionary, Second Edition, is: "Charge, oversight, or management, implying responsibility for safety." And it defines the words "care for" used in the brochure as follows: "To watch over * * * or guard."

█ We think, in view of all the emphasis that Four Winds put in its brochure on its tour escorts or directors— their careful selection, training and experience, and the many services they would render to members of their tours, that Stevenson had the right to expect that Ceijas would warn her of any danger like the slippery condition of the pier walkway and caution her to use extraordinary care to guard against the peril of such a condition.

The record clearly shows that Stevenson carefully studied the brochure and decided to take a Four Winds tour, because of statements and representations made therein by Four Winds, and that she paid the high price charged by Four Winds for the 47-day tour, because the brochure guaranteed that she would have and could rely upon the aid at all times of an experienced and responsible tour director, who would know precisely where they were at all times from the time the tour began until it ended.

It is fairly inferable that the conditions of the pier walkway were not temporary, but a normal condition, and that the pier had been there for a long time, because the walkway planks were much worn. Such wear would have a tendency to make them smooth and more slippery.

Ceijas and Bartholomew, Stevenson, and ten other members of the tour group were in the first small boat used to take the members of the tour group from the large boat to the pier, and Ceijas and Bartholomew were the first to alight on the pier when the first small boat arrived. Ceijas alighted and stood on the pier within three steps of where Stevenson slipped and fell. Hence, he must have noted the condition of the walkway at that point. He certainly must have noticed it if he exercised ordinary care. Moreover, he had been there on another tour or other tours and had walked on the pier when it is reasonable to assume the condition was the same as on the day Stevenson slipped and fell.

All of the members of the tour were elderly, some of them past the age of 80, and Ceijas and Bartholomew assisted all the members of the group from the gunnel of the small boat a distance of about three feet down onto the pier. They even lifted some of the members of the tour group down. In lifting some of the group down, Ceijas demonstrated that he recognized a responsibility to look after the safety of the members of the tour group while they were traveling.

We are of the opinion that the evidentiary facts covered by the stipulation entered into before Judge Choate, which were identical with the facts before Judge King when he overruled the motion for summary judgment on the ground that they were disputed issues of material facts, made out a prima facie case by Stevenson, and that there were disputed issues of fact which should have been submitted to the jury.

Hence, we conclude that Judge Choate erred in directing a verdict for Four Winds and Tiarks.

We think it would be inexpedient for this court at this time to pass on Stevenson's claim, set forth in Count III of her amended complaint, in which she alleged that Four Winds made express warranties to her and breached such warranties. Since we hold that Stevenson is entitled to have her case submitted to a jury, she can introduce any competent and material evidence available to her in support of Counts I and III.

Reversed and remanded for a new trial.