589 So.2d 536 (1991)
Robert PHILIPPE and Viola Philippe
v.
LLOYD'S AERO BOLIVIANO, Travelworld, Olson-Travelworld Organization, Ltd., and Alana International Travel.
No. CA 90 1139.
Court of Appeal of Louisiana, First Circuit.
October 18, 1991.
Writ Denied January 6, 1992.
*537 Penrose C. St. Amant, Gonzales, for Alana Intern. Travel.
Keith Nordyke, June E. Denlinger, Baton Rouge, for plaintiffs/appellants.
Walter F. Marcus, III, New Orleans, for Olson-Travelworld Organization.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
This action is a suit asserting causes of action in tort and contract for a medical condition that developed in a tourist during a South American tour. Made defendants are (1) Olson-Travelworld Organization, Ltd., and one of its corporate divisions, Travelworld, Inc., hereinafter called Olson, the tour organizer; (2) Home Insurance Company (Home), Olson's insurer; (3) Lloyd's Aero Boliviano (Lloyd's), a common carrier airline; (4) ABC Insurance Company, Lloyd's insurer; (5) Alana International Travel (Alana), the plaintiffs' local travel agent; and (6) Commercial Union Insurance Company (Commercial), Alana's insurer. The plaintiffs are Robert and Viola Philippe, a husband and wife. Olson and Home filed a peremptory exception raising the objection of no cause of action.[1] The trial court sustained the exception, and, pursuant to La.C.C.P. art. 934, granted the plaintiffs 30 days to amend their petition to state a cause of action. The plaintiffs did not amend their petition and the trial court rendered judgment dismissing the petition against Olson and Home with prejudice. The plaintiffs took this devolutive appeal.

FACTS
The objection of no cause of action raised in the peremptory exception questions whether the law affords any remedy to a plaintiff under the allegations of the petition. La.C.C.P. art. 927(4); Succession of Bertaut, 572 So.2d 142 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1111 (La.1991). Pursuant to La.C.C.P. art. 931, *538 "[N]o evidence may be introduced at any time to support or controvert the objection that the petition fails to state a cause of action." For purposes of the objection of no cause of action, all facts pleaded in the petition are accepted as true, and any doubts are resolved in favor of the sufficiency of the petition. Succession of Bertaut, 572 So.2d at 144.
The pertinent facts[2] in the petition, as amended, are as follows:
2.
Defendant Travelworld is alleged, on information and belief, to be a division or subsidiary of defendant Olson-Travelworld Organization. Travelworld and Olson-Travelworld Organization are in the business of organizing, promoting, sponsoring, selling and arranging international tours.
3.
Travelworld and Olson-Travelworld Organization prepare, print and distribute in the State of Louisiana advertising, brochures, and literature pertaining to these tours. Travelworld and Olson-Travelworld Organization contract with local travel agents, including travel agents within the State of Louisiana, to perform certain services involved in these tours such as booking reservations. Travelworld and Olson-Travelworld Organization also serve as agents, in the State of Louisiana, for transportation companies and common carriers which provide transportation services in connection with these tours.
4.
Travelworld and/or Olson-Travelworld Organization has distributed various brochures and literature to plaintiffs, pertaining to these tours. In particular, in 1987, Travelworld and/or Olson-Travelworld Organization distributed to plaintiffs in Louisiana brochures pertaining to its upcoming tours of South America.
5.
This literature makes representations about the experience and reputation of Travelworld/Olson-Travelworld and states that they have researched the locations to which they arrange tours.
6.
The literature represents that Travelworld/Olson-Travelworld is a member of various professional organizations which subscribed to standards of professional conduct, including guaranteeing truth in their advertising.
7.
Plaintiffs, having toured on prior occasions with Travelworld/Olson-Travelworld Organization, decided to participate in one of these tours called "Grand South America" which was scheduled for October, 1987. In selecting this tour and choosing to participate in it, plaintiffs relied on the representations made through this literature.
8.
Defendant Alana International Travel is a corporation or other entity which *539 holds itself out to the public as a professional travel agent. Alana was the local travel agent in Gonzales, Louisiana, responsible for making certain arrangements for the "Grand South America" tour.
9.
The literature distributed to plaintiffs instructs them to make inquiries of the local travel agent through which the tour is arranged. The travel agent is represented to be an experienced professional in the travel business, knowledgeable on the details of the tours, and qualified to give guidance about travel.
10.
The responsibilities of Alana included, but were not limited to, providing information on details of the trip, handling billing, contacting carriers to arrange ticketing, issuing tickets, confirming reservations, and accepting payment from plaintiff.
11.
In undertaking these responsibilities, Alana was acting on behalf of, and as agent for, plaintiffs in securing their participation in this tour and providing information about the travel which plaintiffs had selected.
11a.
As part of their efforts to arrange this tour for plaintiffs, representatives of Alana International Travel contacted Olsen-Travelworld/Travelworld [sic] to inquire about health requirements for participants in this tour. Employees of Alana further contacted local health agencies to determine what health precautions should be taken by persons traveling to the countries included in the tour. Alana International Travel and Olsen-Travelworld/Travelworld [sic] had actual knowledge of the health hazards of high altitude areas such as La Paz, Bolivia.
12.
As a consequence of undertaking these responsibilities, Alana stood in a fiduciary capacity toward plaintiffs. This duty included the obligation to inform itself of facts pertinent to the tour plaintiffs had selected, including the risks and special health considerations of such travel, and to disclose such information to plaintiffs.
13.
Plaintiffs purchased tickets for this tour, including tickets on a flight by defendant Lloyd's Aero Bolivano [sic]. Plaintiffs purchased these tickets from Alana, made payment to Alana, and received those tickets through Alana. On information and belief, Alana was acting under contract with, or on behalf of, Lloyd [sic] Aero Bolivano [sic] in soliciting, receiving, and transmitting this payment and ticket in Louisiana.
14.
As part of this tour, plaintiffs flew from Arica, Chile to La Paz, Bolivia on or about October 17, 1987 on Lloyds [sic] Aero Boliviano Flight # 944.
15.
Both Alana and Travelworld/Olson-Travelworld knew that, by selecting the Grand South America Tour, plaintiffs would be travelling by air to Bolivia.
16.
La Paz is located in the mountains at an altitude of more than ten thousand feet. The airport serving La Paz is at an altitude several thousand feet higher than the city. This altitude is significantly higher than any altitude in the United States, particularly in Louisiana, and higher than Arica, Chile, from which plaintiffs departed on the trip to La Paz.
17.
Because of the high altitude, the atmospheric pressure of La Paz is less than that at Arica and less than the pressure typically maintained inside the passenger *540 cabin of an airliner. In order to avoid rapid decompression upon landing at La Paz, it is necessary to make adjustments to the cabin pressure on flight into La Paz.
18.
Because of the altitude, the air at La Paz contains significantly less oxygen than in areas such as Arica or Louisiana.
19.
This change in altitude and lack of oxygen has the propensity for producing physical symptoms and effects, including hypoxia and cerebral hemorrhage, in persons unaccustomed to living at such altitudes.
20.
Information about these hazards is published in professional literature which was, or with the exercise of diligence should have been, available to entities, such as Travelworld/Olson-Travelworld and Alana, which hold themselves out as professionals in the travel business. The risk of suffering such effects are thus foreseeable, particularly to entities which arrange for travel to La Paz.
21.
Plaintiffs had never travelled to La Paz prior to this trip. Therefore, Travelworld/Olson-Travelworld and Alana were in a better position to know of these dangers and, as agent for plaintiffs, had a duty to inform plaintiffs of these health risks.
22.
On information and belief defendant Lloyd's Aero Boliviano owned, leased, operated and/or maintained the airplane used for the flight to La Paz and the crew of that flight were employees and/or agents of defendant Lloyd's Aero Bolivano [sic].
23.
Plaintiffs were accompanied on their tour by a tour manager who was an employee and/or agent of Travelworld and Olson-Travelworld Organization. The literature distributed to plaintiffs represented that this manager was a professional, qualified to serve travellers in all matters. The literature further represented that Travelworld/Olson-Travelworld would care for participants from "portal to portal" of their tour.
24.
On arrival at the La Paz airport, plaintiff Robert Philippe began to experience a variety of symptoms including but not limited to dizziness, lightheadedness, shakiness, headache, nausea, weakness, problems with speech and gait, psychological changes, euphoria, and sleepiness.
25.
These symptoms persisted for several days during his stay in La Paz. The symptoms were of such severity that plaintiff sought medical treatment in La Paz.
26.
When the symptoms did not abate following treatment, plaintiff was forced to terminate the tour early and return to the United States.
27.
Immediately upon his return, plaintiff sought medical care at Oschner Clinic in New Orleans. He has been diagnosed as having suffered bilateral cerebral hemorrhages, rupture of blood vessels in the brain, and edema, resulting from hypoxia and exposure to inadequate oxygen levels at high altitude and, on information and belief, rapid decompression.
28.
These injuries produced and continue to produce permanent atrophy of the frontal lobes, permanent brain damage, *541 personality and behavioral changes and loss of memory.
29.
On information and belief, these injuries occurred during plaintiffs' flight aboard Lloyd's Aero Bolivano [sic] # 944 and were caused by defects in the pressurization equipment and/or the fault of the crew of that flight in failing to take proper steps to insure that pressurization was accomplished in a safe manner.
30.
Since plaintiffs were at all times in the exclusive care, custody and control of Lloyd's Aero Bolivano [sic] and aboard a plane owned and/or operated by Lloyd's Aero Bolivano [sic], plaintiffs specifically plead the doctrine of res ipsa loquitur and the fault of Lloyd's Aero Bolivano [sic] with regard to these events aboard the flight.
31.
Alternatively, plaintiffs allege that Robert Philippe's injuries were the result of exposure to the inadequate oxygen supply at La Paz and that all defendants failed to provide adequate warnings of the dangers of this altitude to persons participating in this tour.
32.
In particular, Alana as the local contact and as the party represented to be qualified to and responsible for providing information to plaintiffs, Alana was in the best position to be aware of and inform plaintiffs of the health dangers of travelling to La Paz. As agent for plaintiffs in arranging this tour, had a duty to disclose this information to plaintiffs, which Alana failed to do. Had plaintiffs been properly warned of the health risks associated with this travel, they would not have purchased the tour nor bought tickets from Alana for such travel.
32a.
In addition Travelworld/Olsen-Travelworld [sic] was responsible for the design of the itinerary of the tour during which this injury occurred. In particular, Travelworld/Olsen-Travelworld [sic] made the decision to include La Paz as one of the sites to be visited, made the decision that the route of the tour would be from Arica, Chile directly to La Paz and made the decision that the journey from Arica to La Paz would be by air.
32b.
The consequence of these decisions was that the Philippes were transported from a site located at approximately sea level to a site that has an altitude in excess of 13,000 feet in less than one hour.
32c.
This short time period produced a significant change in altitude with no opportunity for acclimation to the unusual high altitudes of La Paz. Acclimation, accomplished by moving gradually from low to high altitudes, is a recognized way of reducing the risks of the effects of high altitudes. Travelworld/Olsen-Travelworld [sic], which held itself out as being an expert in the business of designing tours and as having experience in and familiarity with the sites to be visited during their tours, knew or should have know [sic] of the potentially dangerous effects of high altitude, rapid altitude changes, and procedures to avoid and reduce those dangers (e.g., gradual acclimation).
32d.
By designing and carrying out the tour as was done here, Travelworld/Olsen-Travelworld [sic] negligently exposed the Philippes to an unreasonable risk of harm and was negligent in designing the tour itinerary without opportunity for gradual acclimation.
32e.
LAB is also negligent in that its flight from Arica to La Paz, encompassing this rapid change in altitude in a very brief *542 period, exposed the Philippes to a rapid change in altitude without time for adequate acclimation.

NO CAUSE OF ACTION
The plaintiffs assert the trial court erred (1) "in searching for a `case on point' in determining whether plaintiffs' petition states a cause of action", (2) "in failing to evaluate plaintiffs' petitions under Louisiana's duty/risk method of analysis", (3) "in concluding that Louisiana law would not recognize a duty on the part of Olson under the facts alleged in plaintiffs' petitions", and (4) "in sustaining Olson's Exception of No Cause of Action where the petitions adequately plead facts that establish a duty on the part of Olson." Olson and Home respond that "under the Louisiana duty-risk approach there is no duty on Olson, a tour operator, to warn its tour members of the dangers of flying in an airplane."

Nature of the Obligations Between the Philippes and Olson
The briefs of the parties discuss the obligations between the parties pursuant to the law of tort, La.C.C. art. 2315 et seq. Our analysis of the petition, as amended, shows that the legal relations between the parties are controlled by the law of contract, La.C.C. art. 1906 et seq. An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. La.C.C. art. 1756. An obligation can arise from a contract; or it can arise by operation of law, such as from a wrongful act (tort). La.C.C. art. 1757; Payton v. Colar, 518 So.2d 1104 (La.App. 4th Cir.1987). A contract is an agreement by two or more parties in which obligations are created, modified, or extinguished. La.C.C. art. 1906. A wrongful act (tort) is one that causes damage to another and obliges him by whose fault it happened to repair it. La.C.C. art. 2315. La.C.C. art. 1906 et seq. and La.C.C. art. 2315 et seq. are statutes, and, as such, must be interpreted in reference to each other, and in accordance with the standard rules of statutory interpretation.[3] La.C.C. art. 13; La.C.C. art. 9 et seq.; Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir.1984).
The petition alleges the following pertinent facts about the legal relationship between the Philippes and Olson. Olson is in the business of organizing, promoting, arranging and selling international tours. Olson advertises its tours through travel brochures. Olson sends these brochures to local travel agents, such as Alana, and these local travel agents book reservations for people on the tours.[4] The Philippes relied on the representations made in Olson's brochures and decided to participate in the Grand South America Tour scheduled for October of 1987. Alana acted as agent for the Philippes in securing their participation in the tour. Through Alana, the Philippes purchased tickets for the tour, made payment for the tickets, and received the tickets. The Philippes started the tour and participated in it until Mr. Philippe became ill in La Paz, Bolivia.
A contract is formed by the consent of the parties established through offer *543 and acceptance. La.C.C. art. 1927. A detailed travel brochure is an offer to deliver services under conditions stated in the brochure; upon payment of the price of the tour, a contract comes into existence between the parties. Cook v. AAA Worldwide Travel Agency, 352 So.2d 243 (La. App. 4th Cir.1977), reversed on other grounds, 360 So.2d 839 (La.1978). Further, under the facts alleged, the contract between the Philippes and Olson was consummated by performance. La.C.C. art. 1939.
Contracts are either nominate (given a special designation) or innominate (have no special designation). La.C.C. art. 1914. Nominate contracts are subject to the general rules pertaining to all contracts and also are subject to special rules which may modify, compliment or depart from the general rules. La.C.C. arts. 1915 and 1916. The contract between the Philippes and Olson is a nominate contract designated a lease of labor. In Guidry v. Freeman, 555 So.2d 588, 592 (La.App. 1st Cir. 1989) appears the following:
Thus, a servant (employee) for purposes of our Civil Code is any person who lets, hires or engages his services to another to be employed at any work, commerce or occupation whatever for the benefit of him (employer) who has contracted with the servant. La.C.C. art. 164(1) provides that employment contracts of persons who hire out their services for wages are controlled by the Civil Code rules of lease. A lease of labor is a synallagmatic contract based on mutual consent by which one party (the servant or employee) gives to the other (master or employer) his labor (services) at a fixed price. La.C.C. arts. 2669, 2670, 2673 and 2675. La.C.C. art. 2745 provides as follows:
Labor may be let out in three ways:
1. Laborers may hire their services to another person.
2. Carriers and watermen hire out their services for the conveyance either of persons or of goods and merchandise.
3. Workmen hire out their labor or industry to make buildings or other works.
Thus, for purposes of the employer-employee contractual relationship, it is irrelevant whether the employee-servant is an independent contractor or a nonindependent contractor. In either situation, the contractual relationship is governed by the same rules.[[5]] (Emphasis in original)
Olson organized and arranged the Grand South American Tour (its services) and offered it to the Philippes (and other tourists) for a price. The Philippes paid the price and went on the tour. The consent of the parties is implicit from these facts. There was a contract between them.

Olson's Contractual Obligations
The petition alleges the following pertinent facts about the obligations created by the Olson-Philippe contract. The Olson literature (offer) makes representations about the experience and reputation of Olson and states that Olson has researched the locations to which it arranges tours. Olson subscribes to standards of professional conduct espoused by various professional organizations of which it is a member, including truth in advertising. In choosing to participate in Olson's tour (accept Olson's offer), the Philippes relied on the representations in Olson's literature. Olson had actual knowledge of the health hazards of high altitude areas such as La Paz, Bolivia. Olson knew that by participating in the tour, the Philippes would be traveling by air to La Paz, Bolivia. The air in La Paz contains significantly less oxygen because of the altitude. This lack of oxygen has a tendency to produce physical symptoms such as hypoxia and cerebral hemorrhage in persons unaccustomed to living at such an altitude. Information concerning this hazard may be found in professional literature available to Olson. The risk of illness due to altitude is foreseeable for entities that arrange travel to La Paz. Olson was in a better position than the Philippes to know of this risk. An *544 Olson tour escort accompanied the Philippes on the tour. Olson's literature represented (warranted) that its tour escort (manager) was a professional and qualified to serve travellers in all matters. Olson's literature also represented that Olson would care for participants in the tour (the Philippes) from "portal to portal" of their tour. On arrival at the La Paz airport, Mr. Philippe became ill. His illness was later diagnosed as bilateral cerebral hemorrhages and edema resulting from hypoxia. This condition was caused by exposure to inadequate oxygen levels at high altitude and rapid decompression. This illness has caused Mr. Philippe to have atrophy of the frontal lobes of the brain, permanent brain damage, personality and behavioral changes and loss of memory. If properly warned of the health risks associated with this travel, the Philippes would not have participated in the tour. Olson designed the tour so that in less than one hour, the Philippes had to fly from a site near sea level (Arica, Chile) to a site at an altitude in excess of 13,000 feet. This itinerary allowed no opportunity for acclimation to the high altitude. Acclimation means moving gradually from low to high altitude and it is a recognized way to reduce the health risks associated with high altitude. Olson knew, or should have known, of the dangerous effects of high altitude and rapid altitude change, and knew, or should have known, of procedures (acclimation) for reducing the danger of those risks.
Generally, tour organizers (such as Olson) are not insurers of the safety of the tourists with whom they contract and need not warn these tourists of obvious hazards. Connolly v. Samuelson, 671 F.Supp. 1312 (D.Kan.1987); Lavine v. General Mills, Inc., 519 F.Supp. 332 (N.D.Ga.1981). However, the parties may contractually expand or limit their obligations.[6] The instant case is analogous to the case of Stevenson v. Four Winds Travel, Inc., 462 F.2d 899 (5th Cir.1972). Stevenson (the tourist) purchased a South American tour from Four Winds (the tour organizer) through Carolina Motor Club (the local travel agent). The tour began in Florida, and it was escorted by Carlos Ceijas, a Four Winds tour director. During the tour, the group went to Manaus, Brazil, for a boat trip on the Amazon River. During the Amazon boat trip, the boat stopped at a pier on the Rio Negro so the group could visit a rubber plantation. When Stevenson attempted to disembark onto the pier, she slipped, fell and injured herself. Stevenson brought suit against Four Winds and its insurer. After Stevenson presented her case at trial, the trial court entered a directed verdict for the defendants. The appellate court reversed and remanded with the following pertinent rationale:
Hence, the liability of Four Winds depends upon whether there was a duty on the part of Ceijas as the employee of Four Winds to warn Stevenson that the accumulation of water, aqueous plants, and mud on the walkway of the pier made it slippery, and to walk carefully on such walkway to avoid slipping, and whether Ceijas was guilty of negligence in not performing such duty.
By sending copies of the brochure to the Motor Club, Four Winds clearly authorized the Motor Club to distribute copies of the brochure to prospective tour customers of Four Winds.
In the brochure, Four Winds, under the heading, "How to Make a Reservation for Your Four Winds Tour" stated:
"1. Read this brochure carefully and choose a tour which best suits your interests, your vacation time and your budget.
"2. Contact your local travel agent or Four Winds and have an expert help you with your final plans and answer any questions you might have. (Italics ours.)
"3. Make your reservation. A deposit of $100 per person is required to *545 secure your place on the tour you want."
Such statement, we think, clearly showed that Four Winds authorized the Motor Club to answer any questions prospective tour customers had, to accept for Four Winds an application for a reservation and the deposit required, and forward them to Four Winds. That is also confirmed by the fact that Four Winds accepted the application and deposit and sent to the Motor Club for delivery to Stevenson the airplane tickets, the complimentary flight bag, and other material.
Under the law of Florida, the duty of Four Winds, acting through Ceijas, to so warn Stevenson could arise by virtue of the contractual relationship between Four Winds and Stevenson, the terms thereof, and the representations and statements made to Stevenson in the brochure.
The representations and statements of Four Winds in the brochure, with respect to the services that would be rendered by Ceijas as tour director, were a part of what Four Winds obligated itself to do in the tour contract with Stevenson, and Stevenson had the right to rely thereon and did rely thereon.
The brochure stated:
"Four Winds also guarantees that every tour will be escorted by a qualified professional tour director. Our tour directors have been carefully selected and trained * * *.
"In order to insure the best possible personal service, Four Winds tour groups are limited to not more than 28 members.
"Your escorts (tour directors) are also informative, they know precisely what you will be seeing and doing everyday. * * * they've been there before." (Italics ours.)
The brochure also stated that Four Winds guaranteed that each tour would be "fully escorted from start to finish."
The authority and duties of Ceijas as tour director were very broad. Four Winds admitted in its answer to Stevenson's Interrogatory No. 3: "The Tour Director assumes management of all matters pertaining to his tour."
The brochure further stated:
"From the moment you leave until your journey ends, you are cared for by a carefully selected Four Winds Tour escort." (Italics ours.)
One of the definitions of the word "care" in Webster's New International Dictionary, Second Edition, is: "Charge, oversight, or management, implying responsibility for safety." And it defines the words "care for" used in the brochure as follows: "To watch over * * * or guard."
We think, in view of all the emphasis that Four Winds put in its brochure on its tour escorts or directorstheir careful selection, training and experience, and the many services they would render to members of their tours, that Stevenson had the right to expect that Ceijas would warn her of any danger like the slippery condition of the pier walkway and caution her to use extraordinary care to guard against the peril of such a condition.
The record clearly shows that Stevenson carefully studied the brochure and decided to take a Four Winds tour, because of statements and representations made therein by Four Winds, and that she paid the high price charged by Four Winds for the 47-day tour, because the brochure guaranteed that she would have and could rely upon the aid at all times of an experienced and responsible tour director, who would know precisely where they were at all times from the time the tour began until it ended.
It is fairly inferable that the conditions of the pier walkway were not temporary, but a normal condition, and that the pier had been there for a long time, because the walkway planks were much worn. Such wear would have a tendency to make them smooth and more slippery.
Ceijas and Bartholomew, Stevenson, and ten other members of the tour group were in the first small boat used to take the members of the tour group from the *546 large boat to the pier, and Ceijas and Bartholomew were the first to alight on the pier when the first small boat arrived. Ceijas alighted and stood on the pier within three steps of where Stevenson slipped and fell. Hence, he must have noted the condition of the walkway at that point. He certainly must have noticed it if he exercised ordinary care. Moreover, he had been there on another tour or other tours and had walked on the pier when it is reasonable to assume the condition was the same as on the day Stevenson slipped and fell.
All of the members of the tour were elderly, some of them past the age of 80, and Ceijas and Bartholomew assisted all the members of the group from the gunnel of the small boat a distance of about three feet down onto the pier. They even lifted some of the members of the tour group down. In lifting some of the group down, Ceijas demonstrated that he recognized a responsibility to look after the safety of the members of the tour group while they were traveling.
(Emphasis added; footnote omitted; bolding as italics in original)

Stevenson, 462 F.2d at 906-907.
The facts pled in the Philippes' petition are sufficient to allege a cause of action in contract against Olson.[7]
These assignments of error have merit.

DECREE
For the foregoing reasons, the judgment of the trial court in favor of Olson and Home is reversed, judgment is rendered in favor of the Philippes and against Olson and Home overruling the peremptory exception raising the objection of no cause of action, and this case is remanded to the trial court for further proceedings according to law. Olson and Home are cast for the cost of this appeal.
REVERSED AND REMANDED.
NOTES
[1] Olson and Home previously filed a motion for summary judgment. The trial court denied the motion and observed that "the Court without suggesting that there is any real hope for the plaintiffs prevailing on the merits as against movers finds that genuine issues of material fact do exist precluding summary judgment at this time."
[2] The minute entry for the trial of the exception held on October 16, 1989, states that "[A]fter evidence was adduced, the court took this matter under advisement." (Emphasis added). However, in the judgment signed by the trial court on January 24, 1990, the trial court stated that "[A]fter hearing the pleadings and arguments of counsel, the Court considering the law to be in favor of defendants, ..., and against plaintiffs ..." (Emphasis added). The record before us does not contain a transcript of the trial of the exception. This inadequacy in the record is imputable to the appellants and cannot operate to the detriment of the appellees. State ex rel Guste v. Thompson, 532 So.2d 524 (La. App. 1st Cir.1988). If evidence was introduced without objection at the trial of the exception, it could be considered in adjudicating the exception. Davis v. McGlothin, 524 So.2d 1320 (La. App. 3rd Cir.), writ denied, 525 So.2d 1046 (La. 1988) and the cases cited therein. There are exhibits in the form of depositions and business records in the record before us. There is nothing in the record to connect these exhibits with the trial of the exception. (These exhibits may have been used in connection with the trial of the motion for summary judgment.) In this posture, we will adjudicate the merits of the objection of no cause of action raised in the peremptory exception based on the allegations of the petition, as amended, and we will not consider the exhibits.
[3] For a discussion of the significance of distinguishing between tort and contract causes of action see G. Morris, Business Associations, 50 La.L.Rev. 211-228 (1989). Some factual scenarios may give rise to tort and contract causes of action. Philippe v. Browning Arms Company, 395 So.2d 310 (La.1981). For the methodology for determining whether a petition alleges a tort cause of action see Persilver v. Louisiana Department of Transportation, 1991 WL 276787 (La. App. 1st Cir.1991) (decided August 8, 1991, under docket number CW-90-1257).
[4] For cases discussing the legal relations between a tourist and a local travel agent see McCollum v. Friendly Hills Travel Center, 172 Cal.App.3d 83, 217 Cal.Rptr. 919 (Cal.App. 2 Dist.1985); Rookard v. Mexicoach, 680 F.2d 1257 (9th Cir.1982); United Airlines, Inc. v. Lerner, 87 Ill.App.3d 801, 43 Ill.Dec. 225, 410 N.E.2d 225 (1980); Bucholtz v. Sirotkin Travel, Ltd., 74 Misc.2d 180, 343 N.Y.S.2d 438 (3d Dist. 1973). For general Louisiana law on agency (mandate) and brokerage, see La.C.C. art. 2985 et seq.; La.C.C. art. 3016 et seq.; ODECO Oil & Gas Company v. Nunez, 532 So.2d 453 (La.App. 1st Cir.1988), writ denied, 535 So.2d 745 (La. 1989) and the cases cited therein; A. Yiannopoulos, Brokerage, Mandate, and Agency in Louisiana: Civilian Tradition and Modern Practice, 19 La.L.Rev. 777 (1959).
[5] Acts 1990, No. 705 repealed La.C.C. arts. 162 to 165, 167 to 175, and 177. What constitutes a lease of labor remains the same. See La.C.C. arts. 2669, 2675, 2745 et seq.
[6] In many reported cases, the liability of the tour organizer is limited by exculpatory clauses. In the record herein, there are two documents entitled "Tour Membership Certificate" which are signed by the Philippes and which contain contractual disclaimers. For the reasons set forth in footnote 2, we can not consider these documents in deciding the merits of this peremptory exception raising the objection of no cause of action.
[7] The Philippes also allege, in the alternative, that Olson was an agent "for transportation companies and common carriers which provide transportation services in connection with these tours" (such as Lloyd's), that Mr. Philippe's injuries "were caused by defects in the pressurization equipment and/or the fault of the crew of that flight in failing to take proper steps to insure that pressurization was accomplished in a safe manner," and, by implication, that Olson also is liable under this theory. For cases discussing the legal relationships between a tour organizer and a common carrier, see Weiner v. British Overseas Airways Corporation, 60 A.D.2d 427, 401 N.Y.S.2d 91 (1978); Dorkin v. American Express Company, 74 Misc.2d 673, 345 N.Y.S.2d 891 (1973); Feig v. American Airlines, 167 F.Supp. 843 (District of Columbia 1958). The relationship between principal and independent contractor and nonindependent contractor agents under Louisiana law is set forth in Rowell v. Carter Mobile Homes, Inc., 500 So.2d 748 (La.1987); Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968); Daniels v. Dauphine, 557 So.2d 1062 (La.App.2d Cir.), writ denied, 561 So.2d 100 (La.1990). It is unnecessary for us to discuss this alternative theory of recovery. When a petition states a cause of action as to any ground or portion of the demand, the exception of no cause of action must be overruled. Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La.1988); Community Coffee Company, Inc. v. Tri-Parish Construction & Materials Inc., 490 So.2d 1109 (La.App. 1st Cir.1986). This is not a case where two or more actions are cumulated in one petition. See, for example, McGowan v. Ramey, 484 So.2d 785 (La.App. 1st Cir. 1986).